# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2702 | **DATE** | 3/19/2004 |
| **CASE TITLE** | Sandra Sutton vs. John E. Potter, Postmaster General of the United States Postal Service | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for **8 Apr. 04 at 9:00 A.M.**.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: USPS' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. Sutton's Motion for Summary Judgment is, GRANTED IN PART AND DENIED IN PART.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 2 2 2004 | |
| ✓ | Docketing to mail notices. | | date docketed | 63 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 2004 MAR 19 AM 11: 30 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS **FILED**
EASTERN DIVISION

MAR 1 9 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

SANDRA SUTTON,

                Plaintiff,

        v.

JOHN E. POTTER, Postmaster
General of the United States
Postal Service,

                Defendant.

Case No. 02 C 2702

Hon. Harry D. Leinenweber

DOCKETED

MAR 2 2 2004

### MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Sutton (hereafter, "Sutton") filed suit against John Potter, as Postmaster General of the United States Postal Service (hereinafter, the "USPS"), asserting three counts of discrimination and/or retaliation in violation of the Rehabilitation Act, 29 U.S.C. §§ 791, and the Age Discrimination in Employment Act, 29 U.S.C. § 621. Count I alleges that USPS committed disability discrimination against Sutton by terminating her rather than reasonably accommodating her medical condition of allergic rhinoconjunctivitis. Count II alleges that USPS retaliated against Sutton for complaining about her disability discrimination. Count III, since dropped by Sutton, alleged that USPS also committed age discrimination against her. Sutton and USPS have filed cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Sutton's motion seeks summary judgment only as to Count I, whereas USPS prays for summary judgment on both Counts I and II.

63

# I. **LOCAL RULE 56.1**

Local Rule 56.1 of the United States District Court for the Northern District of Illinois ("Local Rule 56.1") establishes procedures that both moving and opposing parties must follow in filing and responding to a motion for summary judgment. Under Local Rule 56.1, the moving party must submit a statement of material facts with "references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 56.1(a)(3). In turn, the opposing party must file "a response to each numbered paragraph in the moving party's statement," and, in the case of disagreement, provide specific references to supporting evidentiary material. Local Rule 56.1(b)(3)(A). If the opposing party does not respond and controvert the moving party's statement of material facts, those facts are deemed to be admitted for the purposes of the motion. Local Rule 56.1(b)(3)(B); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

For the most part, USPS adequately responded to Sutton's Local Rule 56.1 statements. However, as to Sutton's paragraphs 408-414 (statements mostly concerning Sutton's requests for transfer into administrative positions in the early 1990s), USPS failed to comply sufficiently with Local Rule 56.1's requirement that it file disagreements with specific references to supporting evidentiary material. Local Rule 56.1(b)(3)(A). Concerning paragraphs 408-413, USPS responds merely by admitting that Sutton "avers" or "testified" as such – never disputing Sutton's testimony with any

supporting evidentiary material. Therefore, the Court deems paragraphs 408-413 admitted – and considers them true in the factual record detailed below.

Likewise, in paragraph 414, Sutton stated that "USPS already had her applications on record and her supervisors knew of them as well." USPS responded by denying that Sutton's CFS supervisors knew of the specific positions that she applied for. However, USPS supported its response only with testimony from the affidavit of Margaret Hoffman. This testimony, in context, only partially refutes Sutton's paragraph 414. In it, Hoffman states only that she doesn't remember if she ever knew whether Sutton applied for any other jobs, and conceded that she "may have" told Sutton she was too sick to get those positions. Therefore, this statement is also partially admitted, to the extent that it does not contest that Sutton's *supervisors* (plural) knew of the positions she applied for, nor does it dispute that Hoffman knew of her applications – disputing only that Hoffman does not remember if she knew.

## II. **FACTUAL BACKGROUND**

The Court compiled the following factual record through thorough study of the parties' briefs, Local Rule 56.1 Statements of Material Facts, and evidentiary materials. Based on all available information, the Court concludes that although the parties might disagree as to small details in the factual record, they do not dispute any material facts. Even in some of these rare

minor disputes, the Court concluded that the supporting evidence unquestionably supported one party's version of the events beyond the ability of any reasonably jury to find to the contrary.

In October 1988, USPS hired Sutton to work as a Central Mark Up clerk in the Central Forwarding System ("CFS") Unit at the North Suburban facility in River Grove, Illinois. As early as 1989, Sutton's work in the dusty CFS environment caused her to develop a medical condition known as allergic rhinoconjunctivitis. In 1991, upon a recommendation from Sutton's doctor, the USPS Medical Department ordered that USPS place Sutton in a "temporary light duty assignment" in a "dust free area." On April 2, 1992, the U.S. Department of Labor Office of Workers' Compensation Programs (the "OWCP") accepted Sutton's claim of disability.

On April 21, 1992, USPS transferred Sutton to the recently-completed facility in Palatine. Because the room housing Palatine's CFS unit was not complete, USPS directed Sutton to work on a different floor handling magazines. Within five hours of arriving at Palatine, Sutton suffered a serious allergic attack as a result of her disability and the conditions on the magazine floor. Sutton went home and never returned to work at Palatine or anywhere else for USPS.

Throughout 1991, 1992 and 1993, numerous doctors filed medical reports on Sutton's behalf to USPS, frequently requesting her transfer to a dust-free environment. These requests continued after Sutton's unsuccessful transfer to Palatine, and the resulting

allergic attack.  On April 27, 1992, shortly following Sutton's allergic reaction at Palatine, USPS Fitness for Duty Doctor Sarmiento recommended that Sutton "needs to be transferred to an office environment free of dust mites and irritants that may exacerbate her symptoms, ideally out of Central Markup Unit.  In December 1992, Sutton's personal physician Dr. Percy May concurred, declaring Sutton "totally disabled" but advising that "she be moved to an area free from dust, dust mites, paper mites, and away from all odors associated with computer and other machine operated apparatus.  In December 1993, Dr. May again certified that Sutton should not work "until she is able to work in a dust and mite free environment."

Beginning in 1989, and accelerating in 1991 and early 1992, Sutton also applied for other positions within USPS, but did not receive any of them.  Most of these applications occurred prior to her transfer to Palatine, and the subsequent allergic reaction. The last recorded incident of Sutton applying for a non-CFS job occurred on May 21, 1992, when Sutton applied for six open non-CFS jobs.  Following this mass-application, Sutton never again sought work outside of CFS as she believed USPS had her applications on file.

On April 22, 1993, the day after the incident at Palatine, USPS wrote Dr. May requesting his assistance in finding alternative work for Sutton, and posing a number of specific questions to him concerning what kind of work he would deem appropriate.

Specifically, USPS asked if Sutton could work as a letter carrier, as a clerk in a small non-mechanical office, or as an employee at either a mechanized or non-mechanized manual distribution center or office environment, and whether she still had restrictions from working near computers. Despite his previous and subsequent opinions that Sutton could work in a dust-free environment, Dr. May responded to this inquiry only by stating that Sutton was "totally disabled for usual work." Dr. May neither responded to USPS' specific job questions, nor did he suggest any type of work that Sutton could do.

Between 1993 and 1997, neither Sutton nor USPS demonstrated any practical interest in getting Sutton back to work either at her old job or in a new assignment. During this period, Sutton filed no additional job applications or transfer requests, choosing instead to collect disability benefits. USPS, for its part, made sporadic and lackluster efforts toward returning Sutton to employment. The Court documents these efforts, in full, below.

In March 1994, USPS scheduled Sutton for a work capacity evaluation with an allergist to determine what USPS work she could do. However, when Sutton could not attend this appointment due to an unrelated surgery, USPS never rescheduled it. In June 1995, USPS wrote to OWCP seeking a second medical opinion regarding Sutton's disability. In September 1996, USPS directed Sutton to undergo an evaluation by Dr. Baltazar Espiritu concerning her condition. Dr. Espiritu recommended that USPS assign Sutton to a

"relatively new building as workplace, complete with adequate ventilation" to "determine whether her symptoms would recur while working as a central mark up clerk." In April 1997, OWCP referred Sutton to Dr. Margaret Matheis, a rehabilitation counselor, to help facilitate Sutton's reemployment.

In August 1997, USPS finally issued Sutton a limited-duty job offer to return her to work. USPS offered to send Sutton back to Palatine as an automated mark up clerk, the same position she held previously, but with a clean air machine installed near Sutton's work station. Sutton rejected this job offer, after Dr. May opined that it would inadequately accommodate her condition. In particular, Sutton objected that USPS's proposed clean air machine accommodation was too weak to sufficiently clean the large CFS room. Sutton notes that the actual machine that USPS purchased for her, in May 1998, can handle up to 15,000 cubic feet, whereas the CFS room totals 169,920 square feet. Sutton further objected that USPS offered her only a "limited duty" assignment, a USPS classification designed to accommodate only temporary disabilities. However, Sutton notes that even USPS conceded in a September 27, 1997 that she "needs a permanent job offer at some point," proving that USPS did not believe that the Palatine CFS position amounted to a fully-adequate accommodation.

Additionally, under USPS regulations, a disabled employee's rejection of a job offer should trigger a "suitability" determination. This entails USPS investigating whether the offered

job would sufficiently accommodate the disabled employee. A USPS finding that the job is "suitable" would result in the employee losing disability benefits. Here, USPS failed to ever conduct the required suitability determination – permitting Sutton to reject the job offer without losing her disability benefits.

USPS reacted to Sutton's rejection of this job offer by effectively doing nothing for nearly three years. In May 2000, OWCP sent Sutton a letter declaring that it no longer considered her too disabled to resume work as a central mark up clerk. Although Sutton protested OWCP's decision with medical evidence from Dr. Marsha Vetter, OWCP refused to rescind its decision. On July 6, 2000, OWCP notified Sutton that her benefits would end effective July 15, 2000, more than eight years after Sutton first went on disability leave. When Sutton did not show up for work at Palatine on July 15, 2000, USPS informed her that it considered her absence undocumented leave and informed her that if she was ill, she would need to submit medical verification of her inability to work. Sutton responded by contacting USPS's Leave Control and requesting an additional 30 days of unpaid leave due to sickness. For the next sixteen months, Sutton followed the same procedure of calling in sick once a month and requesting more unpaid leave, supported by letters from Dr. May declaring her permanently disabled. At no time during this period did Sutton express a desire to return to work or request a transfer or other employment accommodation. For its part, USPS concedes that it had dust-free

- 8 -

jobs to which it could have transferred Sutton during both her time on disability and unpaid medical leave.

On October 5, 2001, an OWCP hearing representative issued a written opinion affirming OWCP's decision to cut Sutton's disability benefits. The written opinion gave Sutton ninety days to appeal to the Employees' Compensation Appeals Board, which Sutton, according to her amended complaint, pursued. However, the Court has no knowledge of the outcome of this appeal - or if the appeal remains ongoing. Also, in October 2001, USPS sent Sutton a letter offering her a choice of three ways to end her career at USPS: resignation, optional retirement, or disability retirement. Sutton instead elected the unmentioned option four: she filed an informal complaint with the USPS' Equal Employment Opportunity office (the "EEO"), asserting a claim of "unreasonable accommodation for medical restriction." In November 2001, Sutton received a notice of "administrative separation" (i.e., termination) from USPS. In December 2001, Sutton formally complained to the EEO.

### III.   **STANDARD OF REVIEW**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the

governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In assessing the moving party's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## IV.  DISCUSSION

### A.  Statute of Limitations

USPS argues that nearly all of Sutton's claims prior to September 2001 are time-barred. USPS noted that a federal employee asserting a discrimination claim must contact an EEO counselor

within 45 days of "the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). Since Sutton first contacted the EEO on October 25, 2001, USPS contends that she faces a statutory time-bar prohibiting all of her claims stemming from conduct allegedly occurring prior to September 10, 2001. This excludes all of Sutton's claims except those arising from her October 2001 termination.

USPS further argues that Sutton cannot escape the statute of limitations by taking advantage of the continuing violations doctrine, for two reasons. First, USPS contends that a continuing violation is one which not could be reasonably expected to generate a lawsuit when it first occurs, because its character as a violation did not become clear until it was repeated, citing *Dasgupta v. Univ. of Wisconsin Bd. of Regents*, 121 F. 3d 1138, 1139 (7th Cir. 1997). Here, USPS contends that Sutton must have suspected discrimination as early at 1994, when she filed a prior EEO complaint, and therefore cannot invoke the continuing violations doctrine. Secondly, USPS argues that a job transfer, which is what Sutton claims she sought, constitutes a single event and therefore not a continuing act.

In general, the continuous violations doctrine permits a plaintiff to get relief for a time-barred conduct "by linking it with an act that is within the limitations period." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir.2000)(internal

citations omitted). A plaintiff may establish a continuing violation under three theories: (1) the employer made the relevant employment decisions over time, making the precise date of discrimination difficult to determine; (2) the employer has an express policy of discrimination; and (3) discrete acts of discrimination constitute an ongoing pattern, and one of those acts occurred within the limitations period. *Tinner v. United Ins. Co. of America*, 308 F.3d 697, 707 (7th Cir. 2002). However, "the continuing violation doctrine is applicable only if it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct." *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999).

Sutton responds to USPS's argument by attempting to establish a continuing violations theory under what appears to be the first method. Specifically, Sutton insists that her rejection of the August 1997 job offer should have triggered the statutorily required "interactive process" to accommodate her reasonably. In Sutton's view, the USPS' inaction during this time amounts to a continuous neglect of its statutory duty, tolling the statute of limitations. At a minimum, Sutton argues that her receipt of OWCP disability benefits until July 2000 should excuse her from the requirement to file an EEO complaint till that point. Beyond that, Sutton contends that the Court should further excuse her because the OWCP decision cutting off her benefits did not conclude until October 5, 2001, when an OWCP hearing officer issued a written

opinion (arguably, it did not conclude until even later, as the Court has no knowledge of the outcome of her appeal).

Sutton's argument has some merit. While USPS is correct that a job transfer constitutes a single act inappropriate for the continuing violations doctrine, what is at issue here is a *failure to transfer or otherwise reasonably accommodate*. Unlike a job transfer, which happens on a precise date, the discrimination allegedly suffered by Sutton took the form of a required event *not happening* over an extended, continuous length of time. There was no definitive temporal marker distinguishing for Sutton at what moment USPS' failure to accommodate ceased to constitute the normal and expected administrative delay or red-tape associated with the process of reasonably accommodating, and started characterizing disability discrimination instead. Therefore, the Court finds that the discrimination Sutton suffered did constitute a "continuing violation."

However, although Sutton properly establishes a continuing violation, the Court finds that Sutton cannot take advantage of the continuing violations doctrine with respect to most of the ordinarily time-barred conduct. As the Court noted above, the reasonableness of delaying a suit forms the crux of the continuing violations doctrine. In the Seventh Circuit, "there is no straightforward answer" to the question of how long a reasonable person would wait before "[she] concluded that the silence was in fact an implicit refusal to accommodate the request." *Cox v.*

*Rumsfeld*, 2003 U.S. Dist. LEXIS 14630 at *21 (W.D. Wisc. 2003). That being said, the Court finds that waiting nine years is obviously unreasonable. At some considerably earlier point during this time, a reasonable person should have understood USPS' inaction as a clear signal that it had no intention of reasonably accommodating Sutton. Accordingly, with one hereafter stated exception, the Court **GRANTS SUMMARY JUDGMENT** as to Sutton's claims regarding any conduct preceding September 10, 2001.

The exception concerns Sutton's claim for back-pay for the period following July 15, 2000, when OWCP cut off her disability benefits, and USPS ordered her to report to Palatine, declaring her absence undocumented leave and eventually placing her on unpaid medical leave. These actions constitute discrete acts with their own 45-day statute of limitations window. Sutton internally appealed this particular discrete act, and continued to pursue administrative remedies until at least October 5, 2001. Since federal employees may not file suit while pursuing administrative remedies, Sutton's appeal tolled the statute of limitations until well into the timely period. *Rennie v. Garrett*, 896 F.2d 1057, 1062 (7th Cir. 1990). However, as the Court noted above, Sutton has no timely claim for full back pay during this window, as she had not properly complained about USPS' failure to reasonably accommodate her and return her to work. Therefore, although the Court believes that Sutton's pursuit of administrative remedies tolled the statute of limitations, it limits her permissible

damages to the disability benefits she lost between the July 15, 2000 benefits cut off and the September 10, 2001 commencing of the timely period.

## B. Discrimination Claim

To establish a claim for disability discrimination under the Rehabilitation Act, Sutton must demonstrate that: (1) she was disabled; (2) her employer was aware of her disability; and (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of her job. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). For purposes of summary judgment, USPS does not contest the first two prongs of this test. Therefore, the Court need examine only whether Sutton was a qualified individual who could perform the essential functions of her job if provided with reasonable accommodation.

To qualify for a reasonable accommodation, Sutton must first meet the standard of being a "qualified individual." A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Since "not working is not a means to perform the job's essential functions," a total inability to work "means that one is not 'qualified.'" *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). The determination concerning whether an individual is qualified "must be made as of

the time of the employment decision." *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998).

Sutton certainly met this minimum standard during most of the time she spent off-work. Throughout 1992-1993, her doctors repeatedly requested her transfer to a dust-free environment, requests which USPS basically ignored. In doing so, Sutton's doctors represented that she could do *some* work, albeit not necessarily the job currently assigned her. USPS' failure to reasonably accommodate Sutton during this period probably constituted disability discrimination, although time-barred for purposes of this action.

However, at the time of her administrative separation – Sutton no longer represented herself as partially disabled, but rather as someone who could not do *any* work. In doing so, Sutton ceased being a "qualified individual." For example, Dr. May's October 11, 2000 letter to USPS stated that Sutton was "unable to work until further notice" while his March 5, 2001 letter described Sutton as "unable to work permanently" and his September 24, 2001 letter detailed that she "remains unable to work with headache & rhinoconjunctivitis that occur when exposed to dust and fumes." Multiple times, Dr. May described Sutton's illness as a "condition permanent since 7/12/00." Therefore, the evidence at first-glance suggests that from July 12, 2000 onward, Sutton presented herself as a person totally unable to work, and therefore totally unable to fulfill the requirements of her job.

Although Sutton was not a "qualified individual" as of November 2001, her status on July 15, 2000 is more questionable. As noted above, Dr. May informed USPS several times that Sutton was permanently disabled since July 12, 2000. However, as far as the Court can figure, Dr. May did not first convey this opinion until March 5, 2001. Therefore, at the time USPS declared Sutton absent with undocumented leave, and forced her on unpaid medical leave, it seems possible if not likely that they had no knowledge that Sutton possessed a "condition permanent since 7/12/2000" that rendered her "unable to work." As noted above, the determination as to whether an individual is qualified "must be made as of the time of the employment decision." *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998). Therefore, USPS cannot use Dr. May's post-March 5, 2001 opinions to justify its treatment of Sutton between July 2000 and March 2001.

Indeed, this is especially true because USPS claims it based its July 2000 decision on an opinion holding precisely the opposite – the OWCP ruling that Sutton was not disabled at all, and therefore able to return to work at Palatine (as mentioned above, USPS now admits Sutton is disabled). At that time, all medical opinions on file indicated that Sutton could perform work within a dust-free area. Therefore, at the time USPS placed Sutton on unpaid medical leave, she did constitute a "qualified individual" under the Rehabilitation Act. This does not mean Sutton remained a "qualified individual" until her termination. On March 5, 2001,

when Dr. May first enunciated his opinion that Sutton had a permanent condition preventing her from working *at all*, she ceased being a qualified individual because she, through her doctor, had admitted a total inability to perform the functions of her job – regardless of accommodation.

This means that Sutton can prove disability discrimination for, at most, the period between July 15, 2000 and March 5, 2001, provided she can establish USPS' fault for failure to provide her with reasonable accommodation. In general, the burden of showing that a reasonable accommodation exists rests with the employee. *Mays v. Principi*, 301 F.3d 866, 870-871 (7th Cir. 2002). However, once the employee informs the employer of his or her disability, the employer must engage in an "interactive process" with that employee, designed to "identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Gile v. United Airlines, Inc.*, 213 F.3d 365,373 (7th Cir. 2000)(internal citations omitted). If the employer fails to engage in this "interactive process," the burden of production concerning the availability of a reasonable accommodation shifts from the employee to the employer. *Mays*, 301 F.3d at 870. During this process, the employer must make an offer of accommodation "with sufficient clarity to make the accommodation available to her in a practical sense, so that her rejecting it was her own fault." *Id.*

Here, USPS contends that it met its burden of engaging in the interactive process and providing Sutton with reasonable accommodation by its 1997 offer of a position as a central mark up clerk in the CFS unit at Palatine, accommodated by the installation of an air cleaning unit. In USPS' view, it did not need to reassign Sutton, as the reasonable accommodation process requires only an acceptable offer, not "[providing] literally everything the disabled employee requests." *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 345 (7th Cir. 1996). Post-installation of the clean air unit, USPS insisted that the Palatine CFS position qualified as a reasonable accommodation, because its air quality complied with the minimum standards set by the Occupational Safety and Health Association ("OSHA"). Furthermore, USPS argues that Sutton acted in bad faith by failing to provide justification for refusing the CFS assignment and not repeating her transfer requests originally made 1992-1993 during the 1997-2001 period.

Sutton responds by noting that the CFS position was wholly inadequate for accommodating her acknowledged disability, and therefore cannot meet USPS' burden of providing "reasonable accommodation." She points out that the clean air unit purchased had enough power to clean only 15,000 square feet, while Palatine's CFS unit contained 169,920 square feet of open space. For this reason, Sutton states that her doctors advised her not to accept the position. Additionally, Sutton argues that USPS itself

acknowledged that position's inappropriateness, when it failed to find the position "suitable" under their internal regulations.

The Court agrees with Sutton. Although USPS is correct that the Rehabilitation Act does not obligate it to transfer Sutton, it must nevertheless provide an accommodation suitable to Sutton's condition. By any objective standards, the CFS position at Palatine did not meet this threshold. While it is true that the Palatine position may have complied with OSHA's minimum safety requirements, this is not mean that it qualified as sufficiently clean for Sutton, due to her undisputed hypersensitivity to dust and fumes. Indeed, the fact that USPS never found the job offer "suitable," thereby permitting Sutton to remain on disability, amounts to a near confession by USPS itself that the job offer did not adequately accommodation Sutton's medical problems. This is only compounded by USPS' original classification of the position as a temporary, "limited duty" assignment, though it acknowledged that Sutton required a permanent solution. Due to all this, the Court finds that no reasonable jury could conclude that USPS' Palatine job offer qualified as a "reasonable accommodation."

Therefore, post-Sutton's rejection of the Palatine job, USPS still needed to engage in the interactive process, to properly inform Sutton of her options for reasonable accommodation. USPS failed to do this. Instead, USPS did nothing for three years, until OWCP declared Sutton no longer disabled (although now USPS concedes that Sutton was disabled, for purposes of summary

judgment). Then, USPS responded only by reoffering her the rejected, unacceptable Palatine position - then placing her on unpaid leave for sixteen months under terminating her. Clearly, unpaid medical leave does not meet USPS' burden of engaging in an interactive process, or providing reasonable accommodation.

## C. Retaliation Claim

Sutton has also filed a retaliatory discrimination charge against USPS. 42 U.S.C. § 2000 prevents an employer or labor organization from discriminating against someone because "he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000(e)(3)(a).

To overcome USPS' retaliation summary judgment motion, Sutton must establish retaliatory treatment through either the "direct" or "indirect" method. *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002). The direct method requires Sutton to "provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003)(italics in original). The indirect method demands Sutton establish a *prima facie* case of retaliation by showing that "after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was

performing the job in a satisfactory manner." *Stone*, 281 F.3d at 644.

Here, Sutton proceeds exclusively under the direct method. This requires her to "provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason. A decision maker is the person "responsible for the contested decision." *Rogers*, 320 F.3d at 754 (italics in original, internal citations ommitted). Under "circumstantial evidence," the Court accepts three categories of evidence. Only one of these pertains to this case: evidence such as "suspicious timing, ambiguous statements, oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Venturelli v. ARC Cmty. Servs.*, 350 F.3d 592, 601 (7th Cir. 2003).

USPS then has an opportunity to contradict Sutton's evidence, and present its own evidence that it would have "taken the adverse employment action against [Sutton] even if he had no retaliatory motive." *Stone*, 281 F.3d at 644. If either Sutton's or USPS' evidence stands uncontradicted by the other party, then summary judgment is appropriate. Otherwise, the Court must find a triable issue of fact for the jury. *Id.*

To meet her "circumstantial evidence" burden, Sutton attempts to establish by inference that decision maker Joe Kalisz ("Kalisz") knew of her EEO complaint when he terminated her, and then lied in

deposition about knowing of it. Sutton asks the Court to draw this inference by claiming that Kalisz probably learned of Sutton's complaint by interacting with USPS Labor Relations official Colleen Kelly. However, Sutton provides zero actual proof that Kelly told Kalisz of Sutton's complaint. Sutton then references a memorandum sent to Kalisz, dated *after* her termination, informing Kalisz of her EEO complaint - claiming that this shows Kalisz "lied" in deposition when he claimed to have no knowledge of Sutton's complaint until shortly before his deposition.

The Court does not find Sutton's argument persuasive. Sutton's requested inference does not even meet her burden of showing that Kalisz *knew* of her EEO complaint, as it is very possible that Kelly never informed him of it. Aside from this requested inference, Sutton has nothing to substantiate Kalisz's knowledge of the complaint. While the Seventh Circuit has loosened the circumstantial evidence requirements in recent decisions, a decision maker must still affirmatively *know* of the complaint before a plaintiff can even hope to establish discriminatory intent. *Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003). Since Sutton has not shown Kalisz's knowledge, she cannot show discriminatory intent and therefore her retaliation claim cannot withstand summary judgment.

Sutton tries to get around the knowledge requirement by stating that, although Kalisz was the "final decision maker, he was not the only one." However, by conceding that Kalisz was the

- 23 -

"final decision maker" (*i.e.*, the only one with the actual power to decide), Sutton concedes that for practical purposes Kalisz is the *only* decision maker.  The other individuals named may have *advised* Kalisz, but it is undisputed that only Kalisz had the power to terminate Sutton, and only Kalisz signed the decree terminating Sutton.  Therefore, this argument also fails.

Accordingly, Sutton's summary judgment motion is **GRANTED** solely with respect to her claim that USPS discriminated against her by failing to accommodate her disability between the period of July 15, 2000 and March 5, 2001.  With respect to damages, even this successful claim is limited to the disability benefits Sutton lost – not her full salary.  As to the remainder of Sutton's claims, including the entirety of her retaliation claim, Sutton's summary judgment motion is **DENIED** and USPS' is **GRANTED**.

Before concluding, the Court feels compelled to make note – unfortunately – of the bureaucratic and ineffective conduct of the Postal Service in this matter.  First, it appears that the Postal Service slept through nearly eight years of Sutton collecting disability at government expense.  Second, once awakened from its slumber, the Postal Service's sole action was so woefully inadequate as to suggest a total lack of effort on their part to comply with the statutory requirements of the Rehabilitation Act. In so doing, the Postal Service has done a disservice not only to Sutton, but also to the public at large.  After all, it is we, the Postal Service's customers, who ultimately financed both Sutton's

extended disability "vacation," and the judgment that this opinion requires the Postal Service to pay. The Court hopes that, in the future, the Postal Service endeavors to become a better steward of the American people's stamp dollars.

Since it does not appear that the damage calculations should be disputed, the Court orders the parties to confer and agree on a damage figure consistent with this opinion. If they cannot agree, the Court directs the parties to submit their alternative proposals.

## V.   CONCLUSION

For the reasons stated herein, USPS' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** Sutton's Motion for Summary Judgment is, therefore, also **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: March 19, 2004